UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL BRIGHT-ASANTE,

                Plaintiff,

– against –

SAKS & COMPANY, INC. and THEO CHRIST,

                Defendants.

**OPINION & ORDER**

15 Civ. 5876 (ER)

RAMOS, D.J.:

Michael Bright-Asante brings this case against Saks & Company, Inc. ("Saks") and Theo Christ, Saks's Vice President for Human Resources, (collectively, "Defendants"), alleging unlawful discrimination under 42 U.S.C. § 1981, unlawful discrimination under New York City Human Rights Law ("NYCHRL"), and constructive discharge.[1] Doc. 78. Before the Court is Defendants' motion for summary judgment on all claims. Doc. 131. For the reasons stated below, the motion is GRANTED.

## I. BACKGROUND

### A. Factual Background

The Court assumes familiarity with the facts in its prior decision in this case, *Bright-Asante v. Saks & Company, Inc.*, 242 F. Supp. 3d 229 (S.D.N.Y. 2017). Nevertheless, it will restate and supplement these as necessary below.

Bright-Asante, a forty-three-year-old African-American male, began his employment with Saks at their Fifth Avenue, flagship store on July 23, 2007. Doc. 138 ¶¶ 1–2; Doc. 78 ¶ 7. Bright-Asante was a sales associate in the women's shoe department, where he developed a wealthy and illustrious clientele, including first ladies and some of the richest women in the world. Doc. 137 ¶ 10. He was a strong sales

---

[1] Bright-Asante also brought a claim for unlawful discrimination against the union, Local 1102 RWDSU UFCW ("Local 1102"). However, this cause of action was stricken and Local 1102 was subsequently dismissed from the case. *See* Docs. 85, 115.

associate and one of Saks's top performers. Doc. 139, Ex. J, 10:17–11:12. At the time of his employment, there were approximately ninety-to-one-hundred sales associates in the women's shoe department, and about half of these were minorities. *Id.*, Ex. E, 140:18–142:5.

On August 29, 2014, Bright-Asante made two sales to a woman who represented that she was Maureen Hennessy, an actual Saks credit card holder who, according to Saks, lived in Bronxville, New York. Doc. 138 ¶¶ 3–4. One transaction was for four pairs of shoes, totaling $6,989.77, and the other was for a pair of boots, totaling $2,259.16. *Id.* ¶¶ 12, 24. The customer, however, was not Maureen Hennessy, but rather Crystal Kipp, who Saks had already identified as part of a group perpetrating an ongoing fraud with complicit members of the shoe department. Doc. 133 ¶ 29. Pursuant to the scheme, Saks sales associates and a group of external individuals worked together to make fraudulent purchases using the identities of Saks credit cardholders. Doc. 138 ¶¶ 5, 6, 10. The investigative team, led by Lisa Benson, Director of Internal Affairs, had first identified Kriss Rockson, also a sales associate in the women's shoe department, as having made several fraudulent sales, many using the credit cards of customers who lived in Bronxville. Doc. 133 ¶¶ 5–7. The team then began monitoring for other potentially fraudulent transactions using "exception-based reporting." Per this reporting mechanism, transactions made using the relevant zip code would be reviewed for suspicious activity. Doc. 138 ¶ 7. Information about unusual transactions—usually purchases of high-end women's shoes—would be forwarded to the Manhattan District Attorney's Office and the United States Secret Service, with whom Benson's team had begun coordinating. *Id.* ¶¶ 8–9. Unbeknownst to Bright-Asante at the time, Saks had already identified Maureen Hennessy as one of the scheme's victims. *Id.* ¶ 5.

Because Bright-Asante's sales to Kipp met the "exception-based reporting" criteria, they were identified for further review. Benson reviewed the transactions, including a review of Saks's internal video camera system ("CCTV") footage. Doc. 133

¶ 13. The first transaction for $6,989.77 took place in a back room of the Christian Louboutin area of the women's shoe department. Doc. 138 ¶ 13. The room was closed off to the sales floor by two doors. *Id.* Kipp told Bright Asante that she was a Saks credit cardholder, but that she did not have her credit card with her. *Id.* ¶ 14. Bright-Asante then proceeded to look up her account, which required inputting the last four digits of her Social Security number into the register and reviewing her identification. *Id.* Kipp wrote the last four digits of her Social Security number on a piece of paper and tried to hand it to Bright-Asante, but, rather than input the digits himself, he directed her to do so, giving her access to the Saks register. *Id.* ¶¶ 15–16. He also allowed Kipp to directly input her e-mail address. *Id.* ¶ 17. Though Bright-Asante maintains that high-end customers were allowed to input their own sensitive information, he could not recall at his deposition that he has ever permitted any other customer to do so. *Id.* ¶¶ 15, 18. During the transaction with Kipp, Bright-Asante used his cell phone to take a picture of the driver's license that she had provided for identification, and he may have been texting with someone during the transaction, including while Kipp was using the register. *Id.* ¶¶ 19–20. Bright-Asante eventually keyed in Maureen Hennessy's Saks credit card number to complete the sale. *Id.* ¶ 21. Saks states that the transaction lasted approximately twelve minutes. *Id.* ¶ 22. According to Benson, Bright-Asante's "conduct in giving the customer unfettered access to employee-only areas and the cash register suggested [that Bright-Asante and Kipp] were familiar with each other." Doc. 133 ¶ 27. About fifteen minutes later, Kipp returned—without her bag from the first purchase—to buy a pair of boots. Doc. 138 ¶¶ 23, 25. Bright-Asante processed the sale using the same account number he had used during the first transaction. *Id.* ¶ 24.

Bright-Asante has stated during the course of this litigation that none of his behavior was unusual for a sale of this size and that Saks "encouraged its high-end customers to be treated like royalty." Doc. 138 ¶¶ 13, 15, 22. However, he could not recall "any other customer who he has ever permitted to access a register to input her

3

Social Security number or e-mail address." *Id.* ¶ 18. Upon review, Benson and her team made the determination that Bright-Asante's transactions were indeed fraudulent and reported them to law enforcement for further investigation. *Id.* ¶¶ 27–28.[2]

Bright-Asante maintains that later the same day, he learned that Kipp had asked another sales associate for a gift receipt of the purchases. Doc. 139, Ex. E at 106:1–13. He thought this behavior was odd and reported it to Asset Protection. *Id.* Kipp returned to the store on September 3, 2014 to return her purchases. *Id.* at 107:11–18. She requested that the returns be placed on a gift card, instead of on the credit card she had previously used. *Id.* at 107:19–25. Bright-Asante reported this first to his manager and then to Asset Protection but was instructed to process the transaction as requested. *Id.* at 108:1–13.

On the same day that she returned the shoes she bought from Bright-Asante, Kipp also used Hennessy's information to make a purchase from Susan David, a white Saks sales associate at the Chanel boutique. Doc. 138 ¶ 37. David's transactions were also identified for further review. *Id.* ¶ 38. Benson reviewed the transaction, including the CCTV footage of the sales. *Id.* Based on her review, Benson did not find the transaction suspicious and therefore did not report it to law enforcement for further investigation. *Id.* For example, Benson maintains that David did not take Kipp into a private-closed off area to conduct the sale, did not allow Kipp to access the cash register, and did not use her cell phone during the transaction. *Id.* ¶¶ 39–41. Benson also maintains that David's transaction was shorter than Bright-Asante's. *Id.* ¶ 42.

The video of David's sale was not preserved, which Bright-Asante asserts indicates spoliation because he issued a litigation hold letter to Saks on October 22, 2014. *Id.* ¶ 38. Saks maintains that the video was taped over in accordance with its policy to

---

[2] In Benson's affidavit, she states that "while it was discovered in the course of our investigation that other Sales Associates sometimes retained customer information on their cell phones in violation of policy, Plaintiff's repeated reference to his cell phone during this otherwise suspicious transaction raised a red flag." Doc. 133 ¶ 28.

4

keep videos for no more than 20-30 days, and Bright-Asante's litigation hold letter was received well after that. Doc. 139, Ex. L at 25:20–26:9; *id.*, Ex. O. Bright-Asante, who has never seen the video of David's sale and was not present during the sale, maintains that nothing distinguished his sale to Kipp from David's. The only difference between the two, according to Bright-Asante, is their race. Doc. 137 ¶¶ 61–62.

Bright-Asante and four other Saks sales associates were arrested in connection with the fraud scheme on September 5, 2014. Doc. 138 ¶ 29. He was questioned by the New York Police Department and the Secret Service, and his cell phone was confiscated. *Id.* ¶¶ 30–31. He was ultimately charged with identity theft and grand larceny. *Id.* ¶ 34.

On September 8, 2014, Defendant Theo Christ, Saks's Vice President of Human Resources, notified Bright-Asante that he had been suspended, pending the outcome of his case. *Id.* ¶ 35. Bright-Asante's charges were eventually dropped on speedy trial grounds. *Id.* ¶ 49. He wrote to notify Christ of this development on March 20, 2015 and enclosed a copy of the Certificate of Disposition. *Id.* ¶ 48. In his letter, Bright-Asante did not specifically ask to return to work, and Saks took no steps to reinstate him. *Id.* ¶ 50. In January 2016, he received a package of personal items he had left at Saks when he was arrested. Doc. 137 ¶ 47. Included in the package was a note dated January 2, 2015, stating "Associate No Longer Employed." *Id.*

Meanwhile, on September 14, 2014, Bright-Asante's union, Local 1102 United Food and Commercial Workers, RWDSU ("Local 1102"), had filed a grievance on his behalf, challenging his suspension. Doc. 138 ¶ 46. The grievance was arbitrated on June 23, 2016, but Bright-Asante did not participate in or attend the arbitration. *Id.* ¶¶ 46–47, 52. On July 29, 2016, the arbitrator denied Local 1102's grievance and found that Saks's treatment of Bright-Asante had not violated the Collective Bargaining Agreement. *Id.* ¶ 53.

On May 9, 2018, long after this lawsuit had commenced, Saks offered to reinstate Bright-Asante's employment. *Id.* ¶ 55. Bright-Asante denied the offer and maintains that

5

it was not made in good faith.  *Id.* ¶ 56.  He is currently employed by United Airlines.
Doc. 137 ¶ 63.

### B. Procedural History

Bright-Asante filed this case on July 28, 2015.  Doc. 2.  He amended the complaint on April 4, 2016, bringing various state and federal claims against Saks, Christ, and Local 1102.  Doc. 25.  On June 9, 2016, Defendants moved to dismiss all claims or to compel arbitration because all of the claims arose out of or were related to the Collective Bargaining Agreement between Local 1102 and Saks.  Doc. 32.  Before the Court could decide that motion, an arbitration between Local 1102, on Bright-Asante's behalf, and Saks was held on June 23, 2016; it was decided in Saks's favor on July 29, 2016.  Doc. 138 ¶¶ 46–47, 52–53.  On November 30, 2016, Bright-Asante moved to vacate the award or, in the alternative, to amend his complaint.  Doc. 55.  On March 9, 2017, the Court decided both of the pending motions.  It granted in part and denied in part Saks's motion to dismiss, and denied Bright-Asante's motion to vacate the award.  Doc. 74.  However, the Court granted Bright-Asante leave to amend his complaint.  *Id.*

On March 28, 2017, Bright-Asante filed a Second Amended Complaint, bringing claims for unlawful discrimination under 42 U.S.C. § 1981 and the NYCHRL against Saks and Christ; and for constructive discharge against Saks.  Doc. 78.  He also included a claim against Local 1102, but this claim was stricken and Local 1102 was subsequently dismissed from the case.  Docs. 85, 115.  Saks and Christ answered the Second Amended Complaint on March 31, 2017.  Doc. 79.  They filed the instant motion seeking summary judgment on all claims on March 1, 2019.  Doc. 131.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467

(S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks and citation omitted).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986)).

Nonetheless, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citation omitted).  Indeed,

7

"[t]here must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Id.* (citations omitted). "[W]hen an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citations omitted).

### III. DISCUSSION

#### A. 42 U.S.C. § 1981 Claim

"Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). Moreover, § 1981 protects against the actions of third parties, as well as the actions of a directly contracting party. *Ginx, Inc. v. Soho All.*, 720 F. Supp. 2d 342, 358 (S.D.N.Y. 2010) (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) and *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975)).

Bright-Asante states that Defendants have unlawfully discriminated against him pursuant to 42 U.S.C. §1981 because they continue to "malign" his character, and that he has been "unable to obtain a sales job at comparable stores." Doc. 78 at ¶¶ 62–69. However, he does not identify a specific contract on which to hang this claim. There is nothing in the record to suggest that any of the conduct at issue relates in any way to a contract between Bright-Asante and either Saks or Christ. This claim fails on this basis alone.

Furthermore, as stated in more detail below, Bright-Asante has failed to establish that race played any part in Defendants' actions.

## B. Unlawful Discrimination under the NYCHRL

Asante alleges unlawful racial discrimination under the NYCHRL against both Saks and Christ. The NYCHRL makes it unlawful for any employer "because of the actual or perceived . . . race . . . of any person . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." NYCHRL § 8-107(1)(a)(3). Courts interpret the NYCHRL's provisions "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011). To survive a motion for summary judgment on an NYCHRL claim,

> [T]he plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that "discrimination play[ed] *no* role" in its actions.

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013). However, "a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Id.* at 113 (*citing Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 77–80 (1st Dep't 2009)). "Summary judgment is still appropriate in NYCHRL cases, but only if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." *Id.* In other words, "[s]ummary judgment dismissing a claim under the NYCHRL should be granted only if 'no jury could find defendant liable under any of the evidentiary routes—[the burden-shifting framework set forth in *McDonnell Douglas Corp. v.* Green, 411 U.S. 792 (1993)], mixed motive, direct evidence, or some combination thereof."[3] *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 378–79 (S.D.N.Y. 2014) (internal quotation

---

[3] Notably, however, these frameworks are "not applied to Title VII and NYCHRL claims in identical ways." *Kellman*, 8 F. Supp. 3d at 379.

9

marks and citation omitted); *see also Bennett v. Health Mgt. Sys., Inc.*, 92 A.D.3d 29, 41 (1st Dep't 2011).

The gravamen of Bright-Asante's NYCHRL claim is that he was treated differently than David, a white Saks sales associate who also made sales to Kipp. Doc. 78 ¶¶ 56–57, 59–60. He alleges that none of the other associates investigated were white, even though about half of all Saks associates were white. *Id.* ¶¶ 48–49. The parties agree that to prove his claim based on inconsistent disciplinary practices, Bright-Asante needs "to show that similarly situated employees who went undisciplined engaged in comparable conduct." *Watson v. Arts & Entm't Television Network*, No. 04 Civ. 1932 (HBP), 2008 WL 793596, at *16 (S.D.N.Y. Mar. 26, 20018) (internal quotation marks and citation omitted). To show that Bright-Asante and David were not engaging in comparable conduct, Saks has provided evidence in the form of Benson's testimony that Bright-Asante's transaction with Kipp was different from David's in several significant ways. Namely, Bright-Asante allowed Kipp into a private part of the store; allowed her to access the Saks register; and appeared to be on his cell phone for the duration of the transaction. Though Bright-Asante explains and provides context for this conduct—and even suggests that such conduct was allowed by Saks—he does not dispute it. Doc. 138 ¶¶ 13–20. Contrary to Bright-Asante's contentions, Benson has provided testimony that she reviewed the CCTV video of David's transaction, and that David did not take Kipp to a private area, did not allow her to access the Saks register, and was not on her cell phone during the sale. *Id.* ¶¶ 38–43. Benson provided testimony that if any of these factors had been present, she would have reported David's transaction to law enforcement for further review. *See id.* ¶ 44.

Bright-Asante's main objection to Benson's testimony regarding the David video is that it is inadmissible hearsay and that the underlying videotape is unavailable for review (perhaps, Bright-Asante insinuates, due to spoliation). Consequently, it would be inappropriate for the Court to rely on or consider this testimony at the summary judgment

stage. Bright-Asante is, however, incorrect. Saks maintains that Benson's testimony is not hearsay because it is being offered not for the truth of the matter asserted, but rather to show Benson's motivation in distinguishing between Bright-Asante's and David's conduct. Benson's testimony would be admissible on this basis. *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 420 (S.D.N.Y. 2011) ("Out-of-court statements are not hearsay if offered to show the context within which parties were acting, or to show a party's motive or intent for behavior."). But it would not necessarily be cabined to this limited use at trial.

As an initial matter, Benson's testimony is not of a statement offered for its truth, but rather of her own observations. It is therefore not hearsay. Moreover, pursuant to Federal Rule of Evidence 1004(a), "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if . . . all the originals are lost or destroyed, and not by the proponent acting in bad faith." There is nothing in the record that gives rise to even the slightest inference of bad faith regarding the unavailability of the video. On the contrary, Saks has provided credible evidence that its policy is to keep videos for twenty-to-thirty days, after which the videos are destroyed. Doc. 139, Ex. L at 25:20–26:9. [4] David's sales to Kipp occurred in early September 2014, and Saks did not receive a litigation hold from Bright-Asante until late October 2014, well after thirty days. *Id.*, Ex. O. Nor has Bright-Asante identified any inconsistencies in Benson's testimony that would give this Court pause. There is no inconsistency between Benson's statement that she would identify unusual transactions and pass those along to law

---

[4] Bright-Asante contends that Saks's testimony on this point is inconsistent. During discovery, Bright-Asante took the deposition of Patrick McEvoy, who was designated as a 30(b)(6) witness for Saks. In that deposition, McEvoy testified that when the security DVRs that were in place in 2014 were decommissioned, they "were kept for around 30 to 60 days" before being destroyed. Doc. 139, Ex. L at 24:18–25:12. This is entirely consistent with his statement that "we keep *video* for 20 to 30 days." *Id.* at 25:20–25 (emphasis added). In any event, even if the DVRs were kept for 30 to 60 days, this alone does not give rise to an inference of bad faith because Bright-Asante's litigation hold letter was not received until October 22, 2014, about 48 days after David's sale to Kipp. *Id.*, Doc. O. In other words, even if Saks's policy were to keep video for 30 to 60 days, it may well have already deleted the video by the time it received Bright-Asante's letter.

enforcement and her statement that David's transaction was not unusual and was therefore not passed along. Neither is there an inconsistency between Benson's statement that she did not know for certain whether Bright-Asante and Kipp had any prior relationship and her impression that the video "suggested" a familiarity between the two. The Court finds it appropriate, then, to consider Benson's sworn testimony in deciding this motion. There is no issue of material fact as to "Benson's real motivation for failing to pass on the tape of Susan David to law enforcement"; just as there is no "issue of credibility of the explanation of Saks for failing to produce the tape during discovery." Doc. 143 at 18.

Bright-Asante does not contest that Benson's testimony, when considered, establishes that David is not a proper comparator for Bright-Asante. The two engaged in completely distinguishable conduct. This led Benson to make two separate reporting decisions. Bright-Asante has failed to put forth any evidence that links these different decisions to Bright-Asante's race. Neither has Bright-Asante put forward any additional circumstantial evidence that would give rise to an inference of discrimination.[5] Simply alleging that half of Saks's employees were white, while all of those ultimately arrested for participating in the fraud scheme were minorities, is insufficient to raise the specter of a racial motivation without a finding that the white employees engaged in similar conduct.

Therefore, Bright-Asante's claims against Defendants must fail under any evidentiary theory available, as he has failed to put forth *any* evidence, either by direct or circumstantial evidence, that race played *any* role in Benson's decision to report his conduct to law enforcement. On the other hand, Defendants have properly put forth evidence that their decision was not motivated by race in any way. Importantly, the

---

[5] Bright-Asante alludes to e-mails between Benson and law enforcement officers, but these make absolutely no mention or insinuation of a racial motivation. Nor has Bright-Asante provided any other evidence that race was a motivating factor in identifying members of the fraudulent scheme.

purpose of this analysis is not to relitigate Bright-Asante's criminal charges—or even to determine whether these were appropriate. The sole inquiry here is whether Benson's decision to flag Bright-Asante's transaction with Kipp but not David's was racially motivated. On the evidence before the Court, a reasonable jury could not find that race played any role in Benson's decisions. For these reasons, Defendants' motion for summary judgment on the NYCHRL claim is granted.[6]

### C. Constructive Discharge

Finally, Bright-Asante brings a cause of action for constructive discharge against Saks. "To state a prima facie case for constructive discharge, plaintiff must establish that [he] was constructively discharged and that the constructive discharge 'occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in [a protected] class.'" *Irvine v. Video Monitoring Servs. of Am., L.P.*, No. 98 Civ. 8725 (NRB), 2000 WL 502863, at *7 (S.D.N.Y. Apr. 27, 2000) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). To assert constructive discharge, a plaintiff must show that "rather than discharging him directly, [his employer] intentionally create[d] a work atmosphere so intolerable that he [was] forced to quit involuntarily." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 261 (S.D.N.Y. 2014) (internal quotation marks omitted) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004)). "Work conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee*, 223 F.3d at 73. The Court's inquiry is an objective one.

At the motion to dismiss stage, this Court found that Bright-Asante need not concurrently plead a hostile work environment claim to state a claim for constructive discharge. *Bright-Asante*, 242 F. Supp. 3d at 242–44. The Court further found that his

---

[6] Additionally, the Court notes that Bright-Asante has abandoned all claims against Christ, having not addressed them in his opposition papers. *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (arguments not addressed in opposition are conceded).

13

allegations that he was indefinitely suspended without pay for approximately ten months beginning on September 9, 2014, with no indication that he would ever be called back, was tantamount to termination and that there was no question that a reasonable employee, in Bright-Asante's shoes, would have felt compelled to seek other employment. *Id.* at 243–44. Saks again argues that these facts are insufficient to succeed on a constructive discharge claim. The Court once more disagrees.

However, for the reasons discussed at length above, the evidence obtained during discovery cannot establish that the circumstances surrounding the constructive discharge give rise to an inference of discrimination. Indeed, Bright-Asante has not established that race was a factor at all in his ultimate suspension; nor has he raised any question of material fact to this point. The Court will therefore grant summary judgment on this claim as well.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. In light of this Order, the parties' requests for oral argument are denied as moot. The Clerk of Court is respectfully directed to terminate the motion, Doc. 131, and to close the case.

SO ORDERED.

Dated: March 18, 2020
New York, New York

EDGARDO RAMOS, U.S.D.J.